## Woods v. Resident Homes Ass'n.
*[Cite as 8 AOA 91]*

*Case No. 11915*
*Montgomery County, (2nd)*
*Decided November 28, 1990*

*Don Brezine, 188 West Hebble Avenue, Fairborn, Ohio 45324, for Plaintiff-Appellant.*

*John A. Cumming and Randolph J. Bernard, 600 IBM Building, Dayton, Ohio 45402, for Defendants-Appellees.*

FAIN, J.

Plaintiff-appellant Georgia Woods appeals from an adverse judgment that was rendered upon her wrongful discharge and age discrimination claims, notwithstanding a jury verdict in her favor. She contends that the trial court misconstrued the applicable Ohio statute concerning age discrimination in employment, R.C. 4112.02(A), and that there was evidence to support both verdicts.

With respect to Woods' wrongful discharge claim, we conclude that although there is no evidence in the record to support a verdict against the individual defendants-appellees, there is evidence to support the jury's verdict against defendant-appellee Resident Home Association; accordingly, the judgment in favor of the individual defendants-appellees upon Woods' wrongful discharge claim will be affirmed, the judgment in favor of the Association upon Woods' wrongful discharge claim will be reversed, and this cause will be remanded with instructions to consider the Association's motion, in the alternative, for a new trial, and,

if that motion is denied, to enter judgment accordingly.

With respect to Woods' age discrimination claim, we agree with Woods' construction of R.C. 4112.02(A). However, we conclude that there was a failure of proof at the time that defendants-appellees moved for a directed verdict at the close of Woods' case, upon one of the essential elements of this claim, and that defendants-appellees renewed their motion for a directed verdict at the close of all of the evidence in accordance with *Helmick v. Republic-Franklin Insurance Co.* (1988), 39 Ohio St. 3d 71, first paragraph of syllabus. Accordingly, because defendants-appellees were entitled to a judgment in their favor upon Woods' age discrimination claim, albeit for a reason different from the reason given by the trial court for granting judgment notwithstanding the verdict, the judgment in favor of defendants-appellees upon Woods' age discrimination claim will be affirmed.

I

In February, 1988, Georgia Woods had been employed by defendant-appellee Resident Homes Association for over seven years, and for more than six of those years had been the manager of the Springmill Home, operated by the Association. As the manager of the Springmill Home, Woods was the highest-ranking supervisory employee regularly on site at the home. The Springmill Home was a residential facility for several mentally retarded clients of the Association.

It was essentially uncontroverted that Woods was a valued supervisory employee, with some weaknesses in her organizational skills, whose virtues as an employee, nevertheless, substantially outweighed her vices.

There was testimony that regulations of the Ohio Department of Mental Retardation required that medicine for the inmates of a residential facility for the mentally retarded be kept under lock and key at all times, and that violation of this regulation was a very serious matter, which could result in the revocation of the operator's license to operate the facility. Woods admitted, in her testimony, that the failure to maintain the medicines under lock and key would be a very serious matter.

There was undisputed testimony that on February 5, 1988, one of Woods' subordinates, Jo Lynn Woods,[1] told Peter Roll, the Association's program manager, that Woods had instructed her to leave the medicine cabinet unlocked, but with the padlock aligned in such a way as to make it look, to the casual observer, as though it was locked, except when someone from the central administration was due to visit the home, when it should be kept locked. Jo Lynn Woods also told Roll that there was a violation of the procedure for controlling access to the cash box used to keep money belonging to the inmates.

Roll testified that the allegation concerning the medicine cabinet was extremely serious. He testified that he went to the Springmill Home on the following working day, Monday, February 8, 1988, and checked the medicine cabinet. At that time, he found that the cabinet was locked, that the key for the lock was in the proper place, and that the lock worked smoothly. He also testified that the key to the cash box was in the location described by Jo Lynn Woods.

That evening, Roll telephoned Cathy Owens, another employee at Springmill Home, at work. He asked her, "Cathy, I have become aware of some information pertaining to the medication cabinet. I want you to tell me what you know about it." Roll testified that Owens, a relatively new and junior employee, was initially somewhat reticent in responding to his question, but eventually corroborated Jo Lynn Woods' allegations.

Roll testified that he consulted with Shirley Fowler, the Association's director of residential services. Fowler was apparently a co-director of the Association, answerable directly to the board of trustees. Fowler and Roll both testified that they were initially concerned about the fact that Jo Lynn Woods' serious accusation was uncorroborated, but that when Cathy Owens provided corroboration, Fowler decided that she had to act.

The next morning, February 9, 1988, Woods was summoned to a meeting with Fowler and Roll. There is a serious conflict in the testimony concerning that meeting. It is undisputed that Fowler and Roll confronted Woods with the accusations against her, especially the accusation that Woods had directed her subordinates to keep the medicine unlocked. Fowler and Roll testified that Woods did not deny this allegation, but simply offered the explanation that the lock was small, the key was bad, and she was afraid it would break. Woods, on the other hand, testified that she denied the accusation. She testified that although she had

expressed her desire that the cabinet be kept unlocked while she was physically present in the room in which it was located, she did not instruct that it be kept unlocked at other times. It should be noted that there was undisputed testimony that the cabinet containing the medications also contained other materials that were regularly used at the home.

It is undisputed that, at the conclusion of the meeting on the morning of February 9, Fowler offered Woods the three options of resigning, being fired, or accepting a demotion and working in one of the other homes in a non-supervisory capacity. Furthermore, it is undisputed that Fowler gave Woods until February 11 to decide what she wanted to do. Fowler told Woods that, in the meantime, she should take sick leave--that Woods should not return to the Springmill home.

On February 11, at Woods' request, Fowler went to Woods' home to talk to her. At that time, Woods said that she had decided to accept the demotion option, but there was not yet any discussion of which home she would select.

On February 14, Woods went to Fowler's home, and four residential homes were discussed as possible work places. At that time, Woods selected the Hemphill home. There was some discussion of one of the inmates at the Hemphill home, who was apparently unusually difficult, and, according to Fowler, Woods jokingly observed that she could outrun that inmate, if necessary.

Although both Fowler and Woods, testified that there had been some discussion between them on February 14, concerning the one inmate of the Hemphill home who was especially difficult, Fowler admitted that there had been no discussion of the close relationship that existed between the manager of that home and another employee at that home, or of the problems that that might cause. Fowler admitted that she might have been aware, at that time, of that relationship (they were "housemates"), but testified that she "didn't feel as though there were any difficulties." Later, however, Fowler admitted that that was "not a good situation," and that she subsequently moved the subordinate employee to a different home for that reason.

Although Woods was originally scheduled to start working at Hemphill a few days earlier, she became genuinely ill, obtained a physician's certificate that she was not able to work, and did not begin working at Hemphill until Monday, February 22. She worked at Hemphill from Monday through Thursday, and was off on Friday. On Friday, she contacted the manager of Hemphill to tell her that she would be off sick on Saturday, when she was scheduled to have a 24-hour shift.

Fowler was made aware of the fact that Woods was going to be off sick on Saturday, February 27, 1988. She drove by Woods' house on Friday, and several times on Saturday, and concluded from the apparent absence of Woods' car from her garage, that Woods was not at home.

Woods testified that although she was too sick to work her 24-hour shift on Saturday, the 27th, she had responded to her request by her pregnant daughter for a ride to her daughter's physician for tests. According to Woods, she was really not in good enough shape to drive the 100 miles to honor her daughter's request, but she did so anyway.

The next day, Sunday, February 28, Woods talked to Fowler. Woods had concluded that she could not continue to work at the Hemphill home because of harassment and other difficult working conditions that she described in her testimony. Her purpose in meeting with Fowler was to tell Fowler that she was not going to continue working at the Hemphill home. She evidently began by telling Fowler that she was very sick, and had not been able to work on Saturday, and Fowler interrupted her to tell her that Fowler had checked, and was aware that Woods had not been home the preceding day, when she was supposed to have been very sick.

Woods testified that neither at this meeting, nor at any subsequent meeting, did she tell Fowler that she wished to resign her employment with the Association. Fowler testified that when Woods told her that Woods was no longer willing to work at the Hemphill home, Fowler construed that statement as an expressed desire to resign employment with the Association. Fowler testified, and Woods did not dispute, that there was no discussion, during the conversation on February 28, concerning the possibility of Woods' transferring to a different home. However, Woods testified repeatedly that she neither intended, nor communicated an intention, to quit her employment with the Association. Although Fowler testified that she construed Woods' remarks

as expressing a desire to resign Woods' employment with the Association, Fowler acknowledged that there was no immediately effective resignation at that time. Furthermore, Fowler testified that she told Woods, at that time, "If you're going to resign or if you're going to work, whatever, there needs to be some resolution." Thus, Fowler acknowledged that she regarded Woods' statements as being inconclusive up to that point on the subject of resignation. According to Fowler, however, the result of this conversation was that Woods agreed to give Fowler a letter of resignation by March 2, 1988.

On March 3, 1988, Woods executed a written resignation, with an effective date of March 23.

Woods gave the following account of the events leading up to her resignation:

"Q. Did you feel given what had happened, did you feel at that time that what you were saying was that you voluntarily wanted to resign from the agency?

"A. No, I did not sign the resignation at that time. I was called into the office later. There was a meeting set up that I was to talk about my resignation, and I went down to see Shirley Fowler, and I can't remember what date this was. And I did not want to. I had vacation coming. I wanted to take my vacation at this time. I was told that I needed to sign a resignation, and I refused at this time to do it, and it was a day like yesterday, and I went home, and I had spent maybe a couple hours with her where she just insisted that I sign this resignation and I said that I would not sign it at this time, that I had vacation coming. So I got home, the telephone rang and I was told that if I did not sign this resignation by five o'clock, I would be fired.

"Q. So what did you do?

"A. I could not afford to be fired, because I really need employment, so I had no choice but to go down and sign this resignation."

Subsequently, Woods brought this action, setting forth claims for wrongful discharge, age discrimination in employment, and defamation.

Following the close of Woods' evidence, defendants-appellees moved for a directed verdict as to all claims. The trial court granted a directed verdict as to the defamation claim, and removed that issue from the jury. The trial court denied the motion for a directed verdict as to the other claims. As to the age discrimination claim, the argument concerning the motion for a directed verdict centered around whether Woods had submitted any evidence tending to prove that the person who replaced her was outside of the protected age range (40 to 70 years of age). The trial court found that although there was no direct evidence on this point, there had been testimony that at the time of her demotion Woods was the only home manager employed by the Association who was over the age of 40. The trial court held that this was circumstantial evidence from which the jury might infer that Woods' replacement was under the age of 40.

At the close of all of the evidence, following the trial court's ruling on the admission of exhibits, the trial court made the following statement:

"Okay, they're admitted. Perfunctory motions are reraised and overruled."

The age discrimination and wrongful discharge claims were then submitted to the jury upon instructions to which no exception has been taken. The jury returned with a unanimous verdict awarding $200,000 for wrongful discharge, and $150,000 for age discrimination.

Defendants-appellees moved for judgment notwithstanding the verdict, and, in the alternative, for a new trial. The trial court granted the motion for judgment notwithstanding the verdict, holding that an award of monetary damages is not authorized by Ohio's statutes concerning age discrimination in employment, and that Woods had voluntarily terminated her employment. The trial court did not consider the alternative motion for a new trial, as required by Civ. R. 50(C).

From the judgment notwithstanding the verdict, Woods appeals.

II

Woods' First through Fourth, and Eighth, Assignments of Error are as follows:

"FIRST ASSIGNMENT OF ERROR

"IT IS ERROR TO VACATE A VERDICT AWARDING PLAINTIFF $150,000.00 FOR AGE DISCRIMINATION ON THE GROUNDS THAT O.R.C. 4101.17(B) DOES NOT PROVIDE FOR SUCH AN AWARD BY A JURY WHEN THE COMPLAINT WAS NOT BASED ON THAT STATUTE, BUT ON O.R.C. 4112.02(A) WHICH DOES ALLOW FOR SUCH JURY AWARD.

"SECOND ASSIGNMENT OF ERROR

"IT IS ERROR TO VACATE A VERDICT AWARDING PLAINTIFF $150,000.00 FOR

AGE DISCRIMINATION ON THE GROUNDS THAT PLAINTIFF TERMINATED HER OWN EMPLOYMENT WHEN THE JURY HAS BEEN CORRECTLY INSTRUCTED 'IF YOU FIND THAT SHE WAS REASSIGNED AND HARASSED WITH INTENT TO FORCE HER RESIGNATION, SUCH RESIGNATION WOULD NOT BE VOLUNTARY AND WOULD INSTITUTE A WRONGFUL DISCHARGE' AND HAS FOUND PLAINTIFF WAS WRONGFULLY DISCHARGED AND HAS AWARDED DAMAGES FOR AGE DISCRIMINATION.

"THIRD ASSIGNMENT OF ERROR
"IT IS ERROR TO VACATE A VERDICT AWARDING PLAINTIFF $150,000.00 FOR AGE DISCRIMINATION ON THE GROUNDS OF A READING OF THE EVIDENCE WHICH IS INACCURATE AND BIASED, RECITING AS FACTS TESTIMONY WHICH WAS THOROUGHLY PRESENTED TO THE JURY AND NOT BELIEVED BY THE JURY.

"FOURTH ASSIGNMENT OF ERROR
"IT IS ERROR TO VACATE A VERDICT AWARDING PLAINTIFF $150,000.00 FOR AGE DISCRIMINATION ON THE GROUNDS THAT AN ACTION UNDER O.R.C. 4101.17(B) OUGHT NOT GO TO JURY WHEN THE COMPLAINT WAS NOT BASED ON THAT STATUTE BY ON 4112.02(A) WHICH DOES PROVIDE FOR SUCH JURY DELIBERATION AND VERDICT.

"EIGHTH ASSIGNMENT OF ERROR
"WHEN THE JURY HAS BEEN TOLD THAT BOTH THE AGE DISCRIMINATION AND THE WRONGFUL DISCHARGE ISSUES DEPEND ON THE JURY'S FINDING THAT PLAINTIFF WAS INDEED DISCHARGED, WHEN THE JURY HAS BEEN ASKED TO FIND PLAINTIFF WAS DISCHARGED IN SPITE OF THE FACT THAT PLAINTIFF SUBMITTED A RESIGNATION, WHEN THE JURY HAS BEEN PRESENTED WITH EVIDENCE THAT PLAINTIFF WAS REASSIGNED AND THEN HARASSED INTO RESIGNATION IN A MANNER WHICH CONSTITUTES DISCHARGE, WHEN THE COURT HAS CORRECTLY INSTRUCTED THE JURY 'IF YOU FIND THAT SHE WAS REASSIGNED AND HARASSED WITH INTENT TO FORCE HER RESIGNATION, SUCH RESIGNATION WOULD NOT BE VOLUNTARY AND WOULD INSTITUTE A WRONGFUL DISCHARGE' AND WHEN THE JURY HAS FOUND THAT PLAINTIFF WAS INDEED DISCHARGED, IT IS ERROR FOR THE COURT TO VACATE ONE VERDICT AND SUSTAIN A MOTION FOR JUDGMENT NOV ON THE OTHER BASED ON THE MERE FACT THAT THERE WAS A RESIGNATION LETTER."

Although the Eighth Assignment of Error also involves the wrongful discharge claim, these Assignments of Error all challenge the propriety of the trial court's entry of judgment adverse to Woods on her age discrimination claim, notwithstanding the verdict in her favor.

Woods contends that R.C. 4112.02(A), upon which she expressly relies in her complaint, authorizes an award of compensatory and punitive damages. R.C. 4112.02 provides, in pertinent part, as follows:

"It shall be an unlawful discriminatory practice:

"(A) For any employer, because of the race, color, religion, sex, national origin, handicap, age or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

"***

"(N) An aggrieved individual may enforce his rights relative to discrimination on the basis of age as provided for in this section by instituting a civil action, within one hundred eighty days after the alleged unlawful practice occurred, in any court of competent jurisdiction for any legal or equitable relief that may effectuate his rights. A person who files a civil action under this division is, with respect to the practices complained of, thereby barred from instituting a civil action under section 4101.17 of the Revised Code or from filing a charge with the Ohio civil rights commission under section 4112.05 of the Revised Code."

The trial court and defendants-appellees rely upon *South v. Toledo Edison Co.* (1986), 32 Ohio App. 3d 24, a decision of the Sixth District Court of Appeals, for the proposition that an award of monetary damages is not

authorized pursuant to R.C. 4101.17(B), which is also concerned with age discrimination in employment. Woods relies upon *Garry v. TRW, Inc.* (1985), 603 F. Supp. 157, for the proposition that the language contained in R.C. 4112.02(N) -- "any legal or equitable relief that will effectuate his rights" -- is broad enough to encompass an award of monetary damages.

We find the reasoning of Judge Spiegel, in *Garry v. TRW, Inc.*, to be persuasive. In our view, the General Assembly's declaration that an aggrieved individual may enforce his rights in any court of competent jurisdiction for any legal or equitable relief that will effectuate his rights evidences a legislative intent to authorize an award of monetary damages for a violation of those rights.

Defendants-appellees argue further, however, that even if the trial court was incorrect in its construction of the statute, they are still entitled to judgment in their favor on the age discrimination claim because of a failure of proof concerning a necessary element of that claim.

Both parties agree that an essential predicate for an age discrimination in employment claim is that the aggrieved employee must have been replaced by a person who was not within the protected class (40 to 70 years of age). There was evidence from which the jury could have found that Woods was replaced, following her demotion, by Jo Lynn Woods. Although Jo Lynn Woods' testimony was not transcribed, Georgia Woods' trial counsel asserted, in his closing argument, that Jo Lynn Woods testified that she was 32 years old at the time of the trial, and this assertion was not controverted. Therefore, the record suggests that there was evidence in defendants-appellees' case that the person replacing Georgia Woods, following her demotion, was under the age of 40. There does not appear to be any evidence in the record concerning the age of the person who replaced Woods following the termination of her employment with the Association.

We will assume, for purposes of discussion, that the relevant inquiry is the age of the person who replaced Woods as the manager of the Springmill home, following her demotion from that position. Although there apparently was testimony to that effect presented during the case of defendants-appellees, there was no such testimony during Woods' case. When the trial court denied defendants-appellees' motion for a directed verdict made at the close of Woods' case, it found that the testimony that all of the other managers of homes in the employ of the Association at the time of Woods' demotion were under the age of 40 was circumstantial evidence from which a jury might reasonably infer that Woods' replacement as the manager of the Springmill Home was under the age of 40. We do not agree. The issue for the jury to determine was whether Woods' replacement was under the age of 40, not the ages of the other home managers at the time of her demotion.

Until recently, it was the rule in Ohio that a defendant who had moved for a directed verdict at the close of the plaintiff's case waived his right to a directed verdict upon proceeding to present evidence in his own behalf. *Halkias v. Wilcoff Co.* (1943), 141 Ohio St. 139. *Halkias* was overruled in *Helmick v. Republic-Franklin Insurance Co.* (1988), 39 Ohio St. 3d 71. In that case, it was held that a defendant who has made a motion for a directed verdict at the close of the plaintiff's case does not waive his right to a directed verdict by proceeding to present evidence in his own behalf so long as he renews his motion for a directed verdict at the conclusion of all of the evidence. *Id.*, first paragraph of syllabus. Specifically, it was held that if the defendant was entitled to a directed verdict at the conclusion of the plaintiff's evidence, because of a failure of proof as to one or more essential elements, the defendant is entitled to judgment in his favor, notwithstanding that his motion for directed verdict was overruled, and that the missing evidence has been supplied in the defendant's own case. The only proviso is that the defendant must have renewed his motion for a directed verdict at the conclusion of all of the evidence.

In the case before us, there was no proof adduced during Woods' case to show that she was replaced, following her demotion, by a person outside of the protected age range, an essential element of her age discrimination claim. Therefore, the trial court should have granted the defendants-appellees' motion for a directed verdict made following the close of the plaintiff's evidence.

At the conclusion of all of the evidence, the trial court said, on the record: "Perfunctory motions are reraised and overruled." Although this remark is a little cryptic, we conclude that it refers to defendants-appellees' motions for

a directed verdict, made at the close of Woods' case. These motions would understandably have been regarded by the trial court as perfunctory, since the trial court had already found that there was sufficient evidence adduced in Woods' case to overrule them.

Accordingly, and following *Helmick v. Republic-Franklin-Insurance Co. supra* we conclude that the defendants-appellees were entitled to judgment, as a matter of law, upon Woods' age discrimination claim.

Admittedly, our basis for concluding that the defendants-appellees were entitled to judgment as a matter of law differs from the trial court's reasons for awarding judgment notwithstanding the verdict. However, a judgment may be affirmed if the judgment was properly rendered, as a matter of law, even though the reasons given by the trial court for entering the judgment are erroneous. *Agricultural Insurance Co. v. Constantine* (1944), 144 Ohio St. 275, 283-284.

Woods' First through Fourth Assignments of Error are overruled, and her Eighth Assignment of Error is overruled to the extent that it deals with her age discrimination claim.

### III

Wood's Fifth through Eighth Assignments of Error are as follows:

"FIFTH ASSIGNMENT OF ERROR "WHEN THE JURY HAS AWARDED PLAINTIFF $200,000 FOR WRONGFUL DISCHARGE, IT IS ERROR TO SUSTAIN A MOTION FOR JUDGMENT NOT WITHSTANDING THE VERDICT BASED ON A STATEMENT THAT 'THE GRAVAMEN OF PLAINTIFF'S COMPLAINT AT TRIAL WAS THAT SHE WAS NOT OFFERED A REVIEW OF HER DISCHARGE IN ACCORD WITH PROCEDURE WHICH GOVERNED HER EMPLOYMENT' WHEN THE QUESTION OF REVIEW WAS A MINOR PART OF PLAINTIFF'S ARGUMENT AND A MATTER ON WHICH THE COURT HAD SHOWN BIAS AT TRIAL.

"SIXTH ASSIGNMENT OF ERROR "WHEN THE JURY HAS AWARDED PLAINTIFF $200,000 FOR WRONGFUL DISCHARGE, IT IS ERROR TO SUSTAIN A MOTION FOR JUDGMENT NOT WITHSTANDING THE VERDICT ON THE GROUNDS THAT PLAINTIFF TERMINATED HER OWN EMPLOYMENT WHEN

THE JURY HAS BEEN CORRECTLY INSTRUCTED 'IF YOU FIND THAT SHE WAS REASSIGNED AND HARASSED WITH INTENT TO FORCE HER RESIGNATION, SUCH RESIGNATION WOULD NOT BE VOLUNTARY AND WOULD INSTITUTE A WRONGFUL DISCHARGE' AND HAS FOUND PLAINTIFF WAS WRONGFULLY DISCHARGED.

"SEVENTH ASSIGNMENT OF ERROR "WHEN THE JURY HAS AWARDED PLAINTIFF $200,000 FOR WRONGFUL DISCHARGE AFTER PLAINTIFF HAS INTRODUCED TESTIMONY AND DOCUMENTATION IN PROOF OF THE EXISTENCE OF AN EMPLOYMENT CONTRACT AND OF DISCHARGE IN BREACH OF THAT CONTRACT, IT IS ERROR TO SUSTAIN A MOTION FOR JUDGMENT NOT WITHSTANDING THE VERDICT BASED ON OTHER DICTA FROM THE *MERS V DISPATCH PRINTING* (1985), 19 OS 3D 100 DECISION.

"EIGHTH ASSIGNMENT OF ERROR "WHEN THE JURY HAS BEEN TOLD THAT BOTH THE AGE DISCRIMINATION AND THE WRONGFUL DISCHARGE ISSUES DEPEND ON THE JURY'S FINDING THAT PLAINTIFF WAS INDEED DISCHARGED, WHEN THE JURY HAS BEEN ASKED TO FIND PLAINTIFF WAS DISCHARGED IN SPITE OF THE FACT THAT PLAINTIFF SUBMITTED A RESIGNATION, WHEN THE JURY HAS BEEN PRESENTED WITH EVIDENCE THAT PLAINTIFF WAS REASSIGNED AND THEN HARASSED INTO RESIGNATION IN A MANNER WHICH CONSTITUTES DISCHARGE, WHEN THE COURT HAS CORRECTLY INSTRUCTED THE JURY 'IF YOU FIND THAT SHE WAS REASSIGNED AND HARASSED WITH INTENT TO FORCE HER RESIGNATION, SUCH RESIGNATION WOULD NOT BE VOLUNTARY AND WOULD INSTITUTE A WRONGFUL DISCHARGE' AND WHEN THE JURY HAS FOUND THAT PLAINTIFF WAS INDEED DISCHARGED, IT IS ERROR FOR THE COURT TO VACATE ONE VERDICT AND SUSTAIN A MOTION FOR JUDGMENT NOV ON THE OTHER BASED ON THE MERE FACT THAT THERE WAS A RESIGNATION LETTER."

In each of these Assignments of Error, Woods contends that the trial court improvidently entered judgment adverse to her on her wrongful discharge claim, notwithstanding the jury's verdict.

There was evidence in the record from which the jury could have found that an implied contract of employment arose from the personnel manual used by the Association. Fowler, the Association's co-director, while denying that the Association ever intended to create an implied contract of employment, admitted that the provisions contained in the manual pertaining to discipline were binding upon the Association. This admission is evidence from which the jury could reasonably find that the personnel manual constituted an implied contract of employment. Pursuant to that manual, Woods could only be discharged for cause.

The parties and the trial court spent a great deal of time discussing the propriety of Woods' demotion from her position as the manager of the Stonemill home. However, as Woods herself pointed out in her testimony at trial, her claim was not based upon her demotion, but upon the termination of her employment, which was subsequent to her demotion.

If, as Woods claims, the termination of her employment was involuntary, there is conflicting evidence in the record concerning whether there was just cause for the termination. Furthermore, there seems to be no evidence that the Association complied with the provisions of its manual with respect to the termination, and there was abundant evidence that the Association regarded as binding upon it the provisions in the manual concerned with the manner of accomplishing an employee's termination.

At one point during the course of the trial, defendants-appellees suggested that Woods had become a probationary employee upon her demotion and reassignment to the Hemphill home, and that, as a probationary employee, she was not entitled to the protection of the provisions in the manual concerning discharge. However, Fowler, the co-director of the Association, testified that the provisions of the manual concerning probationary employees were not relevant to the circumstances surrounding the termination of Woods' employment. From this testimony, the jury could reasonably have found that Woods was entitled to the protection afforded by the provisions of the personnel manual concerned with the discharge of permanent employees.

The remaining inquiry is whether the termination of Woods' employment was voluntary. Defendants-appellees argued, and the trial court concluded, that Woods voluntarily resigned her employment, thereby procluding any wrongful discharge claim.

In our view, there was conflicting evidence concerning the voluntariness of Woods' resignation. She testified that she never agreed to resign voluntarily, and only submitted her resignation upon being told that she must either submit her resignation by five o'clock that afternoon or be fired. She also alleged, in her testimony, that she had been subjected to harrassment in her employment at the Hemphill home. If the jury chose to credit Woods' testimony, which was in direct conflict with the testimony of Fowler, Roll, Owens and, presumably, Jo Lynn Woods,[2] the jury could reasonably have inferred that Fowler, Roll, Owens, and Jo Lynn Woods, or one or more of them, were lying, were in bad faith, and, indeed, had conspired to get rid of Georgia Woods. Consequently, there was evidence in the record from which a reasonable jury could have found that Woods' resignation was not voluntary.

Where this is a conflict in testimony, and where the conflicting testimony might reasonably give rise to conflicting inferences, it is not for the trial judge to determine the weight of the evidence, the credibility of the witnesses, or the correct inference to draw among competing conflicting inferences; those functions are reserved exclusively to the jury. *Nickell v. Gonzalez* (1985), 17 Ohio St. 3d 136;. *Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St. 2d 66, 67-69.

From our review of the record, we conclude that whether Woods' resignation was voluntary, or whether it constituted an involuntary termination of her employment, was an issue at fact for the jury, upon which reasonable minds might reach either conclusion. Accordingly, it was error for the trial court to have entered judgment in the Association's favor upon Woods' wrongful discharge claim, notwithstanding the verdict.

Woods' contract of employment was with the Association, not with the individual defendants-appellees. Although Woods has argued, in a supplemental brief invited by this court on this issue, that the individual defendants-

appellees engaged in acts of "misfeasance" with respect to Woods' discharge, their contractual obligations were to the Association, not to Woods. Although Woods now argues that the individual defendants-appellees interfered with her contract with the Association, interference of contract was not pled or tried.

Because Woods' employment contract was with the Association, we are satisfied that the trial court correctly granted judgment in favor of the individual defendants-appellees upon Woods' wrongful discharge claim, notwithstanding the verdict.

Woods' Fifth through Eighth Assignments of Error are sustained insofar as they relate to her wrongful discharge claim against the Association.

### IV

Woods' First through Fourth Assignments of Error having been overruled; her Fifth through seventh Assignments of Error having been sustained; and her Eighth Assignment of Error having been sustained in part and overruled in part, the judgment of the trial court adverse to Woods upon her age discrimination claim will be affirmed, the judgment of the trial court in favor of the individual defendants-appellees upon Woods' wrongful discharge claim will be affirmed, the judgment of the trial court in favor of the Association upon Woods' wrongful discharge claim will be reversed, and this cause will be remanded to the trial court with instructions to consider, in accordance with Civ. R. 50(C), the Association's motion, in the alternative, for a new trial, and, if that motion is overruled, to enter judgment against the Association upon Woods' wrongful discharge claim in accordance with the jury's verdict.

WILSON and GRADY, J.J., concur.

---

[1] We have found nothing in the record to indicate whether Jo Lynn Woods was, or was not, related in any way to Georgia Woods.

[2] We are, to some extent, speculating concerning the testimony of Jo Lynn Woods, because her testimony was not transcribed. However, from the other testimony in the case and the arguments of counsel, it is apparent that Jo Lynn Woods' testimony directly contradicted Georgia Woods' testimony.